**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**COLLEEN MCKIM** and **LARRY AARON,**

                 **Plaintiffs,**           **1:09-cv-650**
                                          **(GLS/DRH)**

        **v.**

**COUNTY OF RENSSELAER; HON. JACK**
**MAHAR,** Rensselaer County Sheriff;
**RENSSELAER COUNTY DEPUTY**
**SHERIFFS JOHN DOE AND RICHARD**
**ROE,** individually and as agents, servants
and/or employees of the County of
Rensselaer; **CITY OF TROY; TROY**
**POLICE OFFICERS MOE DOE AND**
**JOE DOE,**

                 **Defendants.**
_____

**APPEARANCES:**              **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

LaFave, Wein Law Firm      JASON A. FRAMENT, ESQ.
2400 Western Avenue       PAUL H. WEIN, ESQ.
P.O. Box 1534
Guilderland, NY 12084

**FOR THE DEFENDANTS:**

*Rensselaer County Defendants*
Bailey, Kelleher Law Firm     NANNETTE R. KELLEHER,
Pine West Plaza 5, Suite 507  ESQ.
Washington Avenue Extension  CRYSTAL R. PECK, ESQ.
Albany, NY 12205

*Troy Defendants*
City of Troy, Corporation Counsel          CHARLES A. SARRIS, ESQ.
City Hall, One Monument Square
Troy, NY 12180

**Gary L. Sharpe**
**District Court Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiffs Colleen McKim and Larry Aaron commenced this action pursuant to 42 U.S.C. § 1983 against the County of Rensselaer, Rensselaer County Sheriff Jack Mahar, Rensselaer County Deputy Sheriffs "John Doe" and "Richard Roe," the City of Troy, and Troy Police Officers "Moe Doe" and "Joe Doe," alleging federal and state law claims for false arrest and imprisonment, unlawful search and seizure, excessive force, and a state law claim for common law trespass. (*See* Compl., Dkt. No. 1:2.)  Pending are defendants' motions for summary judgment, (Dkt. Nos. 31, 33), and plaintiffs' cross-motion to amend their complaint to identify the "Doe" defendants, (Dkt. No. 39).  For the reasons that follow, defendants' motions are granted, and plaintiffs' cross-motion is denied as moot.

## II. **Background**

On July 3, 2008, at approximately 6:00 a.m., members of the Rensselaer County Sheriff's Department, Troy Police Department, and other law enforcement agencies executed a "no-knock" search warrant for the seizure of crack cocaine at plaintiffs' first floor apartment at 17 101st Street in Troy, New York.[1]  (*See* County Defs. SMF ¶¶ 50-53, 63, Dkt. No. 33:1.)  In entering the premises, the officers used a battering ram to force open the front door, causing damage to the door and the door locks.  (*See* Pls. Counter SMF ¶ 39, Dkt. No. 39:7; Pls. Resp. SMF ¶ 66, Dkt. No. 39:8; County Defs. Mem. of Law at 13, Dkt. No. 44.)  Upon entry, the officers yelled "search warrant," entered plaintiffs' bedroom with guns drawn, and told plaintiffs to get on the floor.  (*See* County Defs. SMF ¶ 5, Dkt. No. 33:1; Pls. Counter SMF ¶ 41, Dkt. No. 39:7.)  At the time the officers entered the bedroom, plaintiff McKim "was wearing only a bathrobe which was not tied in the front," and plaintiff Aaron was naked.  (Pls. Counter SMF ¶ 40, 45, Dkt. No. 39:7.)  Both plaintiffs were handcuffed behind their backs while the officers searched for evidence relative to the search warrant.  (*See id.* at ¶

---

[1]"[Plaintiff] Larry Aaron was the owner of 17 101st Street, Troy, New York," and plaintiff Colleen McKim, Aaron's girlfriend, "resided with ... Aaron [at that address]."  (County Defs. SMF ¶ 50-51, Dkt. No. 33:1.)

3

43.)  During the search, McKim remained in the untied bathrobe, and Aaron

remained naked "until, at some point, the officers allowed him to put

underwear on."  (*Id.* at ¶¶ 44, 45.)

Shortly after the search began, McKim was taken into the bathroom

by a female officer and asked where drugs were located in the residence.

(*See* County Defs. SMF ¶¶ 57-58, Dkt. No. 33:1.)  McKim told the officer

where marijuana could be found in the apartment, and also that a shotgun

was kept in the bedroom closet.  (*See id.* at ¶¶ 59-60.)  The contents of

plaintiffs' bedroom closet where the shotgun was kept were emptied on the

bedroom floor.  (*See id.* at ¶¶ 61-62.)  According to plaintiffs, during the

emptying of their closet, "photographs were stepped on and [Aaron's] dvd

collection was searched."  (Pls. Resp. SMF ¶ 64, Dkt. No. 39:8.)

Ultimately, both the shotgun and marijuana were found and confiscated.

(*See* County Defs. SMF ¶ 62, Dkt. No. 33:1.)  At the conclusion of the

search, which lasted approximately one hour and forty-five minutes, "Aaron

was given an appearance ticket for violating ... New York State Penal Law

§ 221.05 – Unlawful Possession of Marijuana."[2]  (*Id.* at ¶¶ 63, 68.)  No

_____

[2]These charges were ultimately adjourned in contemplation of dismissal.  (*See* County
Defs. SMF ¶ 70, Dkt. No. 33:1.)

4

cocaine was found in plaintiffs' residence.  (*See id.* at ¶ 71.)

The investigation leading up to the search of plaintiffs' residence apparently began on June 23, 2008, when a confidential informant (CI) contacted Michael Riley, an Investigator with the Rensselaer County Drug/Gang Task Force in the City of Troy.  (*See id.* at ¶ 12.)  The CI, who had successfully performed four previous controlled buys for the Rensselaer County District Attorney, told investigator Riley that he could purchase crack cocaine from a specified individual in the City of Troy.  (*See id.* at ¶¶ 13, 14.)  Investigator Riley and members of the City of Troy Special Operations Section met with the CI to discuss details as to how he could make the purchase.  (*See id.* at ¶ 17.)  That same day, Investigator Riley set up a controlled buy with the CI.  (*See id.* at ¶ 18.)  At that time, the CI was checked for contraband, and Investigator Riley provided the CI with a transmitter and provider currency to effect the purchase.  (*See id.* at ¶ 19.)  Ultimately, the CI successfully purchased crack cocaine and returned to an agreed upon location.  (See *id.* at ¶ 21.)

On June 25, the CI again telephoned Investigator Riley, informing him that he had been taken to a "stash house" in the City of Troy.  (*See id.* at ¶ 23.)  According to defendants, the CI told Investigator Riley that

"there were a total of four locations in the City of Troy which were maintained by two drug dealers known to the CI and involved in illegal drug activities."  (*See id.* at ¶ 24.)  In a written statement provided that same day, the CI identified one of the drug dealers as "Stink" and described one of Stink's residences as an apartment on 6th and Glenn Avenue in Troy, New York.  (*See* Pls. Counter SMF ¶ 8, Dkt. No. 39:7.)  The CI further described the apartment as being on "the [first] floor of a white house," but stated that he would "have to show [the investigators] the house because [he was] not sure of the number."  (Frament Aff., Ex. E, June 25, 2008 CI Statement at 3, Dkt. No. 39:5.)

After the CI had given his statement, Investigator Riley had the CI bring him to the four addresses identified to verify the location of each. (*See* County Defs. SMF ¶ 27, Dkt. No. 33:1; Pls. Resp. SMF ¶ 27, Dkt. No. 39:8.)  Defendants contend that "[u]pon arriving to the area of 6th and Glenn, the CI advised Riley that he was mistaken about the cross-streets of the residence"; "directed Investigator Riley to continue driving for approximately one block"; and "then identified 17 101st Street as the correct residence."  (County Defs. SMF ¶¶ 28-30, Dkt. No. 33:1.)  Although a statement of these events was recorded in a "Follow-Up Report" made later

6

that day, (*see* Riley Aff., Ex. B, Follow-Up Report, Dkt. No. 33:4), and the CI later corroborated their occurrence in a second voluntary statement given on July 1, 2008, (*see* Riley Aff., Ex. C, July 1, 2008 CI Statement, Dkt. No. 33:4), plaintiffs, without any citation to the record, deny that these events occurred, (*see* Pls. Resp. SMF ¶¶ 28-30, Dkt. No. 39:8 (denying defendants's assertions as "inadmissible hearsay and not ... facts")).

In addition to the June 25 identification of plaintiffs' residence, defendants further contend that "[w]ithin the next 3-5 days, Investigator Riley, together with his supervisor Investigator [Arthur] Hyde, again had the CI take him to the locations identified."  (County Defs. SMF ¶¶ 7, 33, Dkt. No. 33:1.)  During the trip, defendants claim, "the CI provided information to Investigators Riley and Hyde as to the activities occurring in each residence"; "again identified 17 101st Street as a residence that he had been to on at least two occasions in the past two weeks and witnessed illegal drugs being sold"; and that "a drug dealer by the street name of "Stink" resided in the first floor apartment [at that address] and sold drugs out of the residence."  (*See id.* at ¶¶ 34-36.)  In response to these factual assertions, plaintiffs again baldly deny them as "inadmissible hearsay and not ... fact[s]."  (Pls. Resp. SMF ¶¶ 34-36, Dkt. No. 39:8)

7

On June 27, based on the CI's representations, Investigator Riley applied for the search warrant that ultimately supported the July 3 search. (*See id.* at ¶ 39.)  In total, Investigator Riley's application sought the "no-knock" entry and search of the four residences allegedly identified by the CI, including plaintiffs' residence.  (*See id.* at 39-40.)  In the application, Investigator Riley stated that on June 25, 2008, the CI gave him "detailed information regarding illegal drug dealings of persons known to the CI as 'Stink,' 'Sport,' and 'Chuck,'" including that "'Stink' has custody and control over three different addresses in the City of Troy ..., where [he] sells crack cocaine and marijuana."  (Frament Aff., Ex. B, Warrant Appl. at 2, Dkt. No. 39:2.)  The application lists one of the three addresses as "Seventeen 101st Street 1st Floor Apartment."  (*Id.*)  With respect to that address, Investigator Riley stated in the application that the CI told him that Stink currently resided there with his girlfriend; "described the address as a large white house next to a blue house near Sixth Avenue"; and "stated ... that he had been inside of the Seventeen 101st Street 1st Floor Apartment with 'Stink' on two separate occasions within the past two weeks and on both occasions, 'Stink' made crack cocaine sales from the apartment."  (*Id.* at 3.) Investigator Riley further stated in the application that he "drove the CI to

8

the address," and that "[t]he CI identified the address given as the correct

address." (*Id.*)  In addition, Investigator Riley averred that "the CI has given

information in the past that has proven to be both accurate and reliable and

which has led to five previous drug purchases and two search warrants,

which resulted in the seizure of illegal drugs and contraband." (*Id.* at 2.)

And finally, Investigator Riley requested in the application that the "search

warrant authorize the executing Police Officers to enter the premises to be

searched without notice ... on the grounds that there is reasonable cause to

believe that: (1) The property sought may be easily and quickly destroyed

or disposed of, [and] (2) The giving of such notice may endanger the life or

safety of the executing Police Officers or another person." (*Id.* at 4.)  The

basis given for this belief was as follows:

> Your deponent can state from personal experience that it is
> common practice of persons who are involved in the illicit use
> and trafficking of controlled substances to attempt to remove,
> destroy, or dispose of said controlled substances if notice or
> authority is given prior to the execution of said warrant.  Also,
> your deponent can state from personal experience, that by
> giving prior notice of executing said warrant, the suspects will
> have time to prepare themselves, and said residence, from the
> officers making a forced entry, which may endanger the lives
> and safety of the officers and persons inside said residence.

(*Id.*)  Ultimately, finding that probable cause supported the warrant

application, Judge Matthew Turner of the City of Troy Criminal Court issued

the warrants sought, permitting the unannounced entry and search of the

listed premises.  (*See id.*; County Defs. SMF ¶ 46, Dkt. No. 33:1.)  About a

week later, on July 3, the warrants were executed. (*See* County Defs. SMF

¶ 48, Dkt. No. 33:1.)

A couple weeks later, on July 14, John F. Tedesco, then Assistant

Chief of the Troy Police Department, authored a memorandum to the then

Chief of the Troy Police Department, relating to the execution of the four

search warrants.  (*See* Frament Aff., Ex. A, Tedesco Mem., Dkt. No. 39: 12

(filed under seal).)  In the memo, Tedesco was critical of the supervisory

oversight and investigative efforts surrounding the incident.  (*See id.*)

Tedesco concluded that:

> Supervisory members of the Rensselaer County Drug Force
> failed to provide sufficient oversight of this investigation.  The
> lack of corroboration of the CI's assertions reflects shallow
> investigative efforts.  The points in the Analysis section of this
> report ... are not extraordinary efforts.  Rather they reference
> basic investigative protocols that were ignored.

(*Id.* at 3.)  Similarly, in deposition, Tedesco testified that he "did not feel

there was enough investigation to substantiate some of the things they

were told by the [CI] .... Principally the amount of narcotics that they felt

that they could secure." (Thomas Aff., Ex. H, Tedesco Dep. at 23:5-14, Dkt. No. 31:12.)  Further, Tedesco opined that "they should have done more investigation using at least [surveillance and controlled buys]." (*Id.* at 24.)

On May 4, 2009, plaintiffs commenced this action in New York State Supreme Court, Rensselaer County, against the County of Rensselaer, Rensselaer County Sheriff Jack Mahar, Rensselaer County Deputy Sheriffs "John Doe" and "Richard Roe," the City of Troy, and Troy Police Officers "Moe Doe" and "Joe Doe, alleging federal and state law claims for false arrest and imprisonment, unlawful search and seizure, and excessive force, and a state law claim for common law trespass. (*See* Compl., Dkt. No. 1:2.)  On June 4, 2009, defendants removed the case to this court based on federal question jurisdiction. (*See* Notice of Removal, Dkt. No. 1:3.)

## III.  Standard of Review

The standard for the grant of summary judgment is well established and will not be repeated here.  For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle,* 499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007).

11

## IV.  Discussion

### A.   *Monell* Claims

The City of Troy and County of Rensselaer argue that the claims against them should be dismissed because plaintiffs have failed to allege or offer evidence of any policy or custom that caused their alleged constitutional injury.  (*See* Troy Defs. Mem. of Law at 7-10, Dkt. No. 31:4; County Defs. Mem. of Law at 6-9, Dkt. No. 33:2.)

"To hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove ... (1) an official policy or custom that (2) cause[d] the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (citation and internal quotation marks omitted).  A municipality's "failure to train or supervise [its] employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the ... employees interact."  *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Here, in arguing that their claims against Rensselaer County and the City of Troy should not be dismissed, plaintiffs contend that "[a] policy or custom of failure to adequately train and misleading a local court Judge

12

can be inferred from defendants' 'shallow investigative efforts.'" (Pls. Mem. of Law at 17, Dkt. No. 39:10.)  Plaintiffs base this contention on (1) Assistant Chief Tedesco's July 14 memorandum and subsequent testimony, which were critical of defendants' investigative efforts; (2) Investigator Riley's testimony that he "never" attaches a copy of an informant's criminal history to a search warrant application; and (3) the alleged omissions and misrepresentations made in Investigator Riley's search warrant application.  (*See id.* at 16-17.)

These contentions fail to establish an inference of the requisite custom or policy.  Even assuming that defendants' investigation was inadequate, that not attaching an informant's criminal history to a search warrant could amount to a constitutional violation, and that Investigator Riley omitted and misstated key information in the search warrant application, plaintiffs have offered no evidence suggesting any connection between such misconduct and the training given or not given by the municipal defendants.  Absent that connection, plaintiffs' failure to train claims cannot survive.  *See Oklahoma City v. Tuttle*, 471 U.S. 808, 830 (1985) (explaining that proof of a municipal employee's unconstitutional conduct is insufficient to establish inadequate training absent proof relating

to the nature of the training itself); *Vogelsang v. Cnty. of Cayuga*, No. 95-CV-1123, 1998 WL 146293, at *5 (N.D.N.Y. Mar. 25, 1998) (explaining that a claim for inadequate training requires a plaintiff to submit proof "focus[ing] on the 'adequacy of the training program in relation to the tasks the particular employees must perform.'" (quoting *Harris*, 489 U.S. at 390)).[3]

 Further, to the extent that plaintiffs are also attempting to allege claims of inadequate supervision, those claims are similarly unsupported by the record.  Specifically, plaintiffs point to no evidence that any decisionmaker was on notice of and failed to investigate a serious problem of unconstitutional conduct, or that such conduct was condoned by the municipal defendants.  Thus, plaintiffs' inadequate supervision claims cannot survive.  *See Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 396 (S.D.N.Y. 2009) (citations omitted) (explaining that to establish a

---

[3]*See also Wray v. City of New York*, 490 F.3d 189, 196 (2d Cir. 2007) (explaining that where a municipality "has a training program, a plaintiff must ... identify a specific deficiency in [that] program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation" (citation and internal quotation marks omitted)); *Walker v. City of New York*, 974 F.2d 293, 296 (2d Cir. 1992) ("[T]o establish inadequate training, plaintiffs must put forward some evidence that the [municipality] itself has acted or consciously not acted." (citing *Oklahoma City v.Tuttle*, 471 U.S. 808, 832 (1985))); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("[A] single incident ..., especially if it involved actors below the policy-making level, does not suffice to show a municipal policy." (citations omitted)); *Walker v. N.Y.C. Police Dep't*, No. 94 CV 3608, 1996 WL 391564, at *6 (E.D.N.Y. June 24, 1996) (granting summary judgment where "plaintiff's allegations of inadequate training [were] based solely on his own interactions with [an officer and] ... plaintiff [did] not allege[] any specific training procedures that were not implemented").

claim for failure to supervise or discipline, "[a] plaintiff must demonstrate that [a] decision-maker was on notice of a potentially serious problem of unconstitutional conduct, that the need for corrective action was obvious, and that the decision-maker failed to investigate or take action in circumstances suggesting deliberate indifference to the rights of those being harmed").

Accordingly, absent evidence of a custom or policy leading to plaintiffs' alleged constitutional injuries, plaintiffs' claims against the County of Rensselaer and the City of Troy are dismissed.  And because plaintiffs attempt to establish liability against Rensselaer County Sheriff Jack Mahar on the basis that "he created [such] a custom or policy," (Pls. Mem. of Law at 24-25, Dkt. No. 39:10), plaintiffs' claims against Sheriff Mahar are also dismissed.

**B.   Unreasonable Search and Seizure**

Defendants next argue that plaintiffs federal and state law claims for unreasonable search and seizure should be dismissed because the entry and search of plaintiffs' residence was conducted pursuant to a valid warrant.  (*See* County Defs. Mem. of Law at 9-14, 16-17, Dkt. No. 33-2; Troy Defs. Mem. of Law at 10-11, Dkt. No. 31:4.)  Plaintiffs dispute this

contention, arguing that the affidavit submitted by Investigator Riley in support of his warrant application contained false statements and omitted various material facts, thereby rendering summary judgment on these claims improper.  (*See* Pls. Mem. of Law at 18-20, Dkt. No. 39:10.)

Both the Federal and New York State Constitutions protect citizens from unreasonable searches and seizures.  *See Bancroft v. City of Mt. Vernon*, 672 F. Supp. 2d 391, 401 (S.D.N.Y. 2009).  A search or seizure is presumed reasonable when conducted pursuant to a warrant issued by a neutral magistrate.  *See Martinetti v. Town of New Hartford Police Dep't*, 112 F. Supp. 2d 251, 252-53 (N.D.N.Y. 2000).  Indeed, "a magistrate's determination that probable cause exists to support the issuance of a warrant is entitled to great deference from a reviewing court," and "[a]ny doubt about the existence of probable cause must be resolved in favor of upholding the warrant."  *Bancroft*, 672 F. Supp. 2d at 401 (citations omitted).  Accordingly, a plaintiff challenging the validity of a warrant faces a "heavy burden."  *See Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (citation omitted); *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991).  Specifically, that burden requires the plaintiff to make a "'substantial preliminary showing' that the affiant knowingly and

16

intentionally, or with reckless disregard for the truth, made a false statement [or omitted material information] in his affidavit, and that allegedly false statement [or omission] was 'necessary to the finding of probable cause.'" *Golino*, 950 F.2d at 870-71 (citations omitted).

Whether an item of information is "material"—and thus necessary to the finding of probable cause—is "a mixed question of law and fact." *Id.* at 871 (citation omitted). "The legal component depends on whether the information is relevant to a given question in light of the controlling substantive law," and "[t]he factual component requires an inference as to whether the information would likely be given weight by a person considering that question." *Id.* (citations omitted). Where relevancy is identified, "questions of fact may arise as to what weight a neutral magistrate would likely have given such information, and whether defendants acted 'deliberately or recklessly' in omitting [or misstating] the information [at issue]." *Walczyk v. Rio*, 496 F.3d 139, 158 (2d Cir. 2007) (citations and internal quotation marks omitted). However, a court may still grant summary judgment in such circumstances based on qualified immunity "where the evidence, viewed in the light most favorable to the plaintiffs, discloses no *genuine* dispute that a magistrate would have issued

the warrant on the basis of the 'corrected affidavits.'" *Id.* (citation omitted).

Here, as noted above, plaintiffs argue that the search warrant issued

for the search of their residence does not defeat their claims for

unreasonable search and seizure because Investigator Riley omitted and

misstated material facts in the search warrant application.  With respect to

omissions, plaintiffs state that the following items were omitted from the

search warrant application:

> (1) The [CI's] June 25, 2008 statement which makes no
> reference to plaintiffs' residence; (2) The [CI's] criminal history;
> (3) The investigator's notes which make no reference to
> plaintiffs' residence; (4) Defendants' supplemental report; (5)
> The fact that the [CI] was paid for the buys; (6) The fact that the
> [CI] did not grow up in Troy; (7) The Informant's July 1, 2008
> statement; and (8) The fact that defendants never observed
> any criminal activity at plaintiffs' residence even though it was
> under surveillance.

(Pls. Mem. of Law at 19, Dkt. No. 39:10.)  And as to false statements,

plaintiffs point to Investigator Riley's representations that "[t]he [CI]

identified the address given as the correct address," and that "[t]he CI

described the address as a large white house next to a blue house on Sixth

Avenue."  (*Id.* (quoting Frament Aff., Ex. B, Warrant Appl. at 3, Dkt. No.

39:2).)  Plaintiffs claim that these statements were false because the CI

"gave the address of Stink's residence as 6th and Glen [sic], not [the

18

address of their] residence," and because the CI's June 25 statement made no reference to Stink's residence being "next to a blue house."  (*Id.*) According to plaintiffs, given these disparities, the CI did not, as Investigator Riley stated, "identify the address given as the correct address."  (*Id.*)  Plaintiffs' contentions lack merit.

As to falsity, while plaintiffs rely on the CI's initial statement that Stink's residence was located at 6th and Glenn, they have failed to rebut or establish a question of fact as to the evidence corroborating the assertion that the CI did indeed identify 17 101st Street as Stink's residence.  As mentioned above, that evidence includes defendants' June 25 "supplemental" or "Follow-Up" report and the CI's July 1 statement, both of which directly support the conclusion that the CI did, as Investigator Riley averred in the warrant application, physically identify plaintiffs' residence as the "correct address."  (*See* Riley Aff., Ex. B, Follow-Up Report, Dkt. No. 33:4; *id.*, Ex. C, July 1, 2008 CI Statement.)  Other than disputing this identification of their address in a conclusory, unsupported, and somewhat inconsistent fashion, (*see* Pls. Reply SMF ¶¶ 28-36, Dkt. No. 33:1), plaintiffs fail to even address this evidence or otherwise offer any meaningful support for their contention that Investigator Riley's statements

as to the CI's identification were false.

Plaintiffs' attempt to invalidate the warrant based on Investigator Riley's other statement that the CI described Stink's residence as being "next to a blue house" is likewise unavailing.  First, even if the court were to assume the statement's falsity, plaintiffs have failed to offer any evidence to support the conclusion that the misstatement was made intentionally or with reckless disregard for the truth.  And second, even if such an intent could be established, the court is not persuaded—and plaintiffs have made no showing—that omitting the statement from the application would have had any meaningful impact on the probable cause determination. Accordingly, to the extent plaintiffs attempt to rely on Investigator Riley's allegedly false statements to invalidate the warrant, that attempt fails.

Plaintiffs' contentions as to Investigator Riley's omissions fare no better.  In the search warrant application, Investigator Riley stated—and plaintiffs do not dispute—that "the CI ha[d] given information in the past that has proven to be both accurate and reliable and which has led to five previous drug purchases and two search warrants, which resulted in the seizure of illegal drugs and contraband."  (Frament Aff., Ex. B, Warrant Appl. at 2, Dkt. No. 39:2.)  This assertion provided a sufficient basis to

conclude that the CI was credible, that the first-hand information provided relating to drug activity at plaintiffs' residence was reliable, and that there was probable cause to believe that drugs and/or other evidence of drug-related activity would be found at plaintiffs' residence.  *See Bancroft,* 672 F. Supp. 2d at 402 (explaining that reliance on information from a single confidential informant whose information has led to the recovery of contraband in the past is sufficient to support a finding of probable cause). Plaintiffs contend that the omitted information described above undermines this conclusion.  However, as consistent with the principles already discussed, it is well established that "the law does not demand that an officer applying for a warrant volunteer every fact that arguably cuts against the existence of probable cause, as long as he does not omit circumstances that are critical to its evaluation."  *Walczyk v. Rio*, 496 F.3d 139, 161 (2d Cir. 2007) (citation and internal quotation marks omitted). And in this case, the court disagrees with plaintiffs that the omitted information was critical to the probable cause determination or that its inclusion would have defeated probable cause.

Initially, as to the CI's criminal history and history of being paid for past controlled buys, plaintiffs offer no explanation as to how these facts,

without more, could be viewed as material to the probable cause determination, and have failed to allege facts suggesting that Investigator Riley intentionally or recklessly omitted them from the warrant application. Thus, plaintiffs' reliance on these omissions is misplaced.

Plaintiffs reliance on the remaining omissions is also misplaced. First, plaintiffs contend that defendants' June 25 "supplemental" or "Follow-Up" report and the CI's June 25 and July 1 statements were improperly omitted from the warrant application, seemingly arguing that the information contained therein could be viewed as critically undermining the reliability of the CI's identification of the 101st Street address.  The court disagrees.

In the June 25 statement, the CI identified 6th and Glenn as Stink's residence but explained that he would "have to show [the investigators] the house because [he was] not sure of the number."  (Frament Aff., Ex. E, June 25, 2008 CI Statement at 3, Dkt. No. 39:5.)  Defendants' "Follow-Up" report, drafted that same day, states that after the CI's statement was given, Investigator Riley took the CI to addresses given to verify the locations of each.  (*See* Riley Aff., Ex. B, Follow-Up Report, Dkt. No. 33:4.)  During that trip, the report continues, the CI identified the 101st Street address as "the same address [he] referr[ed] to in [his] deposition when

22

[he] made reference to 6th Avenue in the area of Glenn Avenue." (Riley

Aff., Ex. B, Follow-Up Report, Dkt. No. 33:4.)  According to the report, "[t]he

CI stated that he did not grow up in Troy New York and was only using 6th

Avenue and Glenn Avenue as a reference point."  (*Id.*)  The CI's July 1,

2008 statement corroborated these events, stating that:

> On June 25, 2008, I gave Investigator Riley a written statement
> regarding drug dealings in the City of Troy and attempted to
> describe where "Stink" lives.  After the written statement, Riley
> drove as I instructed him as to where to go.  The correct
> address is Seventeen 101st Street 1st Floor Apartment.  I
> pointed to and identified the house as Seventeen 101st Street.
> In my original statement I made reference to the address of 6th
> & Glenn Avenues.  I did not grow up in Troy and don't know the
> city that well.  That is why I was a little off in my original
> description.

(Riley Aff., Ex. C, July 1, 2008 Statement, Dkt. No. 33:4.)

While the information contained in these omitted documents may

have given rise to some doubt as to the accuracy of the CI's

representations, the court declines to credit plaintiffs' largely unexplained

contention that such doubt would have had a critical impact on the probable

cause determination.  Indeed, "probable cause deals with probability, not

certainty."  *Speights v. City of New York*, Nos. 98 CV 4635 & 98 CV 4636,

2001 WL 797982, at *4, (E.D.N.Y. June 18, 2001) (citing *Rivera*, 928 F.2d

at 602).  And in this case, even if the CI's initial misstatement could weigh

against the CI's credibility, a view of the facts in their totality—including the

CI's undisputed track record of reliability and his subsequent *physical*

identification of plaintiffs' residence, which was only a short distance from

the address initially given—weighs against a finding that such a probability

did not exist.  Moreover, even if this information arguably should have been

included in the warrant application, plaintiffs have again failed to offer any

evidence suggesting that Investigator Riley omitted it intentionally or with

reckless disregard for the truth.

Further, and for largely the same reasons, the court is also

unpersuaded that the omission of Investigator Riley's notes and the fact

that defendants did not personally observe criminal activity at plaintiffs'

residence—even when considered in light of other omissions—is sufficient

to invalidate the warrant.  Specifically, in addition to the marginal impact

that such information would have had on the probable cause inquiry,

plaintiffs have again made no showing that this information was omitted

intentionally or with reckless disregard for the truth.

And finally, while plaintiffs place considerable emphasis on then

Assistant Chief Tedesco's opinion that further investigative efforts should

have been undertaken, defendants' failure to perform additional

investigation was not constitutionally required.   *See Bancroft*, 672 F. Supp.

2d at 402 (rejecting plaintiffs' argument that police officers' failure to

"conduct any independent investigation (other than talking with informant

and [other] police officers who had dealt with the informant in the past)

before presenting the warrant application" invalidated the warrant,

explaining that "there is no constitutional requirement that they do so, and

[that a] warrant is not infirm if the police choose to rely on an informant in

lieu of an investigation" (citation omitted)).  Thus, to the extent that plaintiffs

are seeking to invalidate the warrant on the basis of defendants' decision

not to engage in further investigation, that attempt is unavailing.

     Ultimately, then, absent a showing that Investigator Riley intentionally

or recklessly misstated or omitted information critical to Judge Turner's

probable cause determination, that determination is, as described above,

entitled to deference.  And in line with that deferential review, this court is

required "simply to ensure that [Judge Turner] had a substantial basis for

concluding that probable cause existed."  *Rivera*, 928 F.2d at 602 (citation

and internal quotation marks omitted).  Thus, given the  circumstances set

forth in Investigator Riley's search warrant application, including the CI's

proven reliability and first-hand observations that drug activity was

occurring at the addresses identified, the court finds that such a basis

existed and therefore dismisses plaintiffs' federal and state law claims for

unreasonable search and seizure.

**C.    False Arrest and False Imprisonment**

Plaintiffs' federal and state law claims for false arrest and false

imprisonment must also be dismissed.  Specifically, while plaintiffs contend

they were unlawfully detained during the search of their apartment, it is well

settled that a warrant to search a home for contraband based on probable

cause implicitly carries with it authority to detain the occupants at the

premises while the search is conducted.  *Michigan v. Summers*, 452 U.S.

692, 701-05 (1981).  Thus, having already rejected plaintiffs' contention

that the search warrant authorizing the July 3 search was not supported by

probable cause, and because plaintiffs' detainment lasted no longer than

necessary to effectuate the authorized search, plaintiffs' claims for false

arrest and false imprisonment are dismissed.

**D.    Excessive Force**

Plaintiffs' state and federal claims for excessive force also fail.  In

support of these claims, plaintiffs argue that because the search warrant

was not supported by probable cause, "any force the police used was

excessive." (Pls. Mem. at 21, Dkt. No. 39:10.)  Plaintiffs also point to the fact that "defendants used a battering ram on two doors to break into [their] residence," and that "defendants had guns trained on [them] to remain handcuffed throughout the entire search." (*Id.*)  Plaintiffs' arguments lack merit.

First, in light of the court's prior finding that the search warrant was not deficient, plaintiffs' argument that any force was per se unreasonable must fail.  Second, given the search warrant's authorization to enter plaintiffs' residence unannounced, and because there is no evidence suggesting that a less intrusive entry was possible, the court discerns no basis to conclude the defendants' use of force in entering plaintiffs' residence was unreasonable.  And third, as defendants correctly observe, "[i]nherent in [the] authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention." *Muehler v. Mena*, 544 U.S. 93, 98-99 (2005) (citations omitted). Thus, given defendants' belief that narcotic transactions were being conducted in plaintiffs' apartment, the mere facts that plaintiffs were handcuffed and, at times, held at gunpoint, do not alone supply a basis for a claim of excessive force. *See Rincon v. City of New York*, No. 03 Civ.

8276, 2005 WL 646080, at *5-6 (S.D.N.Y. Mar. 21, 2005) (dismissing claim for excessive force during search warrant execution and holding that defendant's handcuffing and use of guns during the search was reasonable given information that narcotics transactions were being conducted in plaintiff's apartment and "the knowledge that guns are the tools of the drug trade").  Moreover, plaintiffs' own testimony belies their assertion that defendants used excessive force during the search of their residence. (*See* Menillo Aff., Ex. O, Aaron Dep. at 23, 24, 28, 34, 53, Dkt. No. 36:1; Menillo Aff., Ex. P, McKim Dep. at 12-13, 16, 18, 32, Dkt. No. 36:2.) Plaintiff Aaron testified in deposition, for example, that he was not hit or physically harmed in any way while being handcuffed or at any other point during the search, and that, "aside from breaking [the] door down," he did not feel that any of the officer's conduct was inappropriate in any way. (*See* Menillo Aff., Ex. O, Aaron Dep. at 23, 24, 28, 34, 53, Dkt. No. 36:1.) Plaintiff McKim testified similarly, describing one police officer as "polite," and stating that she was not hit or otherwise physically harmed when handcuffed, and that none of the officers touched or otherwise treated her inappropriately.  (*See* Menillo Aff., Ex. P, McKim Dep. at 12-13, 16, 18, 32, Dkt. No. 36:2.)  Accordingly, plaintiffs' state and federal claims of excessive

force are dismissed.

**E.     Common Law Trespass**

In their complaint, plaintiffs assert a claim for "common law trespass,"

but make no further mention of that claim in their submissions.

In asserting this claim, plaintiffs appear to be challenging defendants' entry

into their premises on the basis that the warrant authorizing that entry was

deficient.  However, because the court has already rejected the

predicate for this contention—that the search warrant did not legitimately

authorize entry—the claim is dismissed.

**F.     Cross-Motion to Amend**

Finally, given the dismissal of plaintiffs' claims, plaintiffs' cross-motion

to amend their complaint to identify the "Doe" defendants is denied as

moot.

**V.  Conclusion**

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' motions for summary judgment (Dkt.

Nos. 31, 33) are **GRANTED** and plaintiffs' complaint is **DISMISSED**; and it

is further

**ORDERED** that plaintiffs' cross-motion to amend (Dkt. No. 39) is

**DENIED** as moot; and it is further

ORDERED that the Clerk close this case and provide a copy of this

Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

June 28, 2011
Albany, New York

Gary L. Sharpe
U.S. District Judge